Samuel Pardy and Madeline Pardy et al. [1] v. Commissioner. Pardy v. Commissioner
Docket Nos. 45659, 45660, 77182, 84215, 84216.
United States Tax Court
T.C. Memo 1962-117; 1962 Tax Ct. Memo LEXIS 189; 21 T.C.M. (CCH) 614; T.C.M. (RIA) 62117; May 18, 1962
Herbert Barsy, Esq., for the petitioners in Docket Nos. 45659 and 45660. Eugene Bernstein, Esq., 77 W. Washington St., Chicago, Ill., for the petitioners in Docket Nos. 77182, 84215 and 84216. Arthur N. Nasser, Esq., and Delman H. Eure, Esq., for the respondent. FAY
Memorandum Findings of Fact and Opinion In these consolidated proceedings respondent has determined deficiencies in income tax and additions to tax under section 293(b), Internal Revenue Code of 1939, [2] against the various petitioners as follows: Addition to
Year
Deficiency
Tax ( § 293(b))
Samuel Pardy and Madeline Pardy, Docket No. 45659
1948
$327,186.96
$163,593.48
1949
212,032.80
106,016.40
1950
191,518.68
95,759.34
Thomas Manno and Mamie Manno, Docket No. 45660
1948
$327,165.34
$163,582.67
1949
211,732.04
105,866.02
1950
191,193.78
95,596.89
Anthony J. Accardo and Clarice Accardo, Docket Nos.
77182, 84215
1949
$256,887.00
1950
195,669.04
Estate of John (Jack) Guzik, Deceased, and Rose Guzik,
Administratrix, and Rose Guzik, Docket No. 84216
1949
$213,493.46
1950
192,193.06
*190 In Docket Nos. 45659 and 45660 the issues presented for our determination are: (1) Were the payments of $50,000 by the partnership known as Erie and Buffalo Company to Caesar and Leo Benvenuti, respectively, during each of the years 1948, 1949 and 1950 ordinary and necessary business expenses or capital expenditures? (2) Did Erie and Buffalo Company understate its "ins" (gross receipts) for the year 1949 in the amount of $25,412.85? (3) Did Erie and Buffalo Company unintentionally overstate its "outs" (payouts) for the years 1948 and 1949 in the amounts of $18,867.61 and $22,095.44, respectively? (4) Did Erie and Buffalo Company intentionally overstate its "outs" for the years 1948, 1949 and 1950 in the amounts of $680,042.25, $930,930.35 and $861,412.41, respectively? (5) Were the payments made by Erie and Buffalo Company to Anthony J. Accardo and John (Jack) Guzik in 1949 and 1950 ordinary and necessary business expenses or distributions of partnership net income? (6) Was any part of the deficiencies asserted against Samuel Pardy and Thomas Manno for the years 1948, *191 1949 and 1950 due to fraud with intent to evade tax? In Docket Nos. 77182, 84215 and 84216 the basic issue presented for our determination is whether the relationship between John (Jack) Guzik and Anthony J. Accardo, on the one hand, and Samuel Pardy and Thomas Manno, on the other, constituted a partnership within the meaning of section 3797(a)(2). Findings of Fact Stipulations of fact were filed by the parties and are incorporated herein by this reference. For convenience, the facts applicable to the various Docket Nos. will be set forth under the appropriate headings. Docket Nos. 45659 and 45660 During the taxable years 1948, 1949 and 1950 petitioners Thomas and Mamie Manno, husband and wife, and Samuel and Madeline Pardy, husband and wife, resided in Chicago, Illinois, and filed timely joint Federal income tax returns for said years with the then collector of internal revenue, Chicago, Illinois. Thomas Manno, hereinafter referred to as Manno, and Samuel Pardy, hereinafter referred to as Pardy, during the taxable years 1948, 1949 and 1950 derived income from a partnership known as the Erie and Buffalo Company, hereinafter referred to as Erie and Buffalo. United States *192 partnership returns of income (Form 1065) purporting to cover the financial operations of Erie and Buffalo were timely filed with the then collector of internal revenue, Chicago, Illinois, for the taxable years 1948, 1949 and 1950 in the respective names of Sam Pardy and Thomas Manno; Sam Pardy and Thomas Manno, d/b/a Erie and Buffalo Company; and Sam Pardy and Thomas Manno, d/b/a Erie and Buffalo Company. During the taxable years Erie and Buffalo was engaged in Chicago, Illinois, in the business of conducting a lottery commonly known as "policy" and colloquially known as "numbers." The operation of such a business, often referred to as a "wheel" was, and is, illegal in the State of Illinois. Prior to 1948 Erie and Buffalo was owned by several members of the Benvenuti family who, although owning the business, were semi-retired. As a result, the operations of Erie and Buffalo were supervised for the most part by Milton Winfield, Sr. For his services Winfield, Sr. was paid a percentage of the net profit at the end of each month. Sometime in 1947 Manno, who at that time was employed by another wheel known as Roman Silver, had several talks with Caesar Benvenuti regarding the possibility *193 of his taking over the operation of Erie and Buffalo. After his conversation with Caesar Benvenuti, Manno discussed the Benvenutis' proposal with his employer at Roman Silver and received permission to accept the offer provided he finished out the year with Roman Silver. A few weeks later Manno saw Caesar Benvenuti and told him that he could accept the offer but that he would first have to finish out the year with Roman Silver. Caesar Benvenuti agreed. The parties then agreed that in return for the business Manno would pay to each of the Benvenuti brothers, Caesar and Leo, $50,000 a year for 5 years, commencing in 1948. Following his discussions with Caesar Benvenuti, Manno contacted Pardy, told the latter about being offered the business of Erie and Buffalo by the Benvenutis and asked Pardy if he would help him operate the business. Pardy, who at that time was working as an insurance agent, agreed. While Manno was quite familiar with a policy or numbers operation, Pardy knew nothing about the business. To remedy this situation Manno and Pardy decided that the latter would work for the Benvenutis until 1948 when the business was to be turned over to them. Manno and Pardy took over *194 the operation of Erie and Buffalo on January 1, 1948, and thereafter during each of the years 1948, 1949 and 1950 paid sums totalling $50,000 to Caesar and Leo Benvenuti, respectively. In a policy or numbers operation as conducted by Erie and Buffalo a player or bettor wagers that a preselected combination of numbers will appear in a series or class of 24, 12 and/or 6 numbers which are drawn lottery fashion twice daily, 6 days a week, from a drum-shaped or hexagonalshaped container into which there are deposited 78 numbers from 1 through 78. Erie and Buffalo conducted drawings which were referred to as the A.M. drawing and the P.M. drawing. The A.M. drawing was held at approximately 2:30 p.m. and the P.M. drawing was held at approximately 8:30 p.m. Winning wagers were paid according to a varying scale of odds. The odds paid by Erie and Buffalo were 100 to 1 for an ordinary 3 number play on the 24 number class, 200 to 1 for an ordinary 3 number play on the 12 number class, and 1600 to 1 for an ordinary 3 number play on the 6 number class. Plays other than the ordinary 3 number play could be made and the odds, of course, varied according to the type of play. The A.M. and P.M. drawings *195 were generally conducted under the supervision of Winfield, Sr. After Manno and Pardy took over the business, Winfield, Sr's. principal function was restricted to handling of the drawings. The drawing was held in the presence of 15 to 20 persons in a locked room, and no one was permitted to leave the room once the drawing started until the person in charge of the drawing left. As each number was drawn, it was written down and verified. Once a drawing for each class was completed, the numbers were replaced in the container. After the several classes of drawings were completed, the results were printed on slips of paper, referred to as "result slips," which showed whether the drawing was the A.M. or P.M., the classes of the drawing, and the drawn numbers in a single and/or double column. Immediately following the printing, the printed numbers were rechecked against the numbers that were written down simultaneously with the drawing. After the drawing and the printing of the results thereof were completed, the result slips were distributed to the various writers and betting stations for general distribution throughout the area in which Erie and Buffalo operated. In this manner the bettors *196 were apprised of the results of the A.M. and P.M. drawings. An individual who wished to place a bet with Erie and Buffalo did so through what is referred to as a "walking writer" or at a "betting station." A walking writer is one who makes daily excursions throughout a designated area looking for players or bettors who wish to wager on the A.M.0 and/or P.M. drawings. A betting station is a fixed location where a player or bettor can go to make a bet with a writer stationed on the premises. The walking writer and the operator of a betting station were considered independent contractors and could and did write policy wagers for one or more different wheels. Of the total receipts collected by them, they retained 25 percent as their commission and remitted 75 percent to the wheel. Upon receiving a bet, along with the bettor's money, the writer would contemporaneously record the wager with a black lead pencil on two sheets of onion skin, or lightweight paper, and a third piece of paper, between each of which was placed double-faced carbon. On occasion the bettor would record his own wager and, consequently, the books in which the bets were recorded would contain the handwriting of more *197 than one person. Erie and Buffalo required that lightweight paper and doublefaced carbon be used in order to eliminate cheating on the part of its employees and the writers. The original, or first sheet of the lightweight paper, was turned in to Erie and Buffalo, the second lightweight sheet was retained by the writer, and the third sheet was given to the bettor and served as his ticket. The originals of the lightweight papers were stapled together and thereafter were referred to as a "bet book." After he had completed writing his bets on the A.M. or P.M. drawings, the writer would record the total dollar volume of bets written and the net amount to be turned in on a separate sheet of paper called a "top sheet" which was then attached to the bet book. The writer after learning of the results of a prior drawing would also prepare slips of paper recording thereon the numbers combination that had been selected by a bettor and won on the prior drawing, the amounts won, the bet book number, the class selected and the sequence number of the bet. Winning bets were commonly referred to as "hits" and the slips of paper prepared by the writers listing such hits were commonly referred to as *198 "hit slips." During the taxable years 1948, 1949 and 1950 Erie and Buffalo maintained a principal office and two turn-in spots, one of which was designated as a main turn-in spot. The office was in a building located at 2900 South LaSalle Street, Chicago, Illinois. The turn-in spots, although changed on occasion because of police activity, usually were within a two-mile radius of the office. During the years 1948, 1949 and 1950 the main Erie and Buffalo turn-in spot was supervised by Marvin Fishman and the other turn-in spot was supervised by Driskell Jackson. Erie and Buffalo employed persons to gather the daily receipts, the bet books writen for each drawing and the hit slips. These persons would work out of the turn-in spots and were referred to as "runners" or "pick-up men." The pick-up men would make at least four daily excursions contacting the writers and betting station operators, collecting the receipts, bet books and hit slips and notifying said persons of the results of the prior drawing. Some writers would make two daily visits to the turn-in spot and themselves surrender the receipts, bet books and hit slips to employees working at the turn-in spot. In order to eliminate *199 the insertion of fictitious winning bets by writers and employees after the drawing was held and the results were known, Erie and Buffalo required that all bet books be turned in prior to the time the drawing to which they related was to be held. Once having surrendered the original bet books and hit slips to a pick-up man, the walking writers or betting station operators would not see or have possession of them again. The hit slips, bet books and money collected were turned over at the turn-in spot to an employee of Erie and Buffalo who was known as a "cashier." Once having turned in the bet books and hit slips to the cashier, the pick-up men would never see them again. The cashier totalled on an adding machine the amounts appearing on the top sheets attached to the bet books and the amounts appearing on the hit slips. The bet books were totalled by route. The cashier would also collect the net receipts, i.e., gross receipts less the writers' commissions of 25 percent and less any amounts paid on hits. After the cashier totalled the top sheets for a particular route, the bet books, together with the adding machine tape, were bound together by a rubber band and turned over to *200 persons employed by Erie and Buffalo who were known as "ins checkers." It was the duty of the ins checkers to verify the correctness of the amounts recorded in the bet books of the next drawing and the amount recorded on the top sheet attached to every bet book. Generally, if the amount shown on the top sheet attached to the bet book was incorrect, the shortage or overage was noted thereon in red pencil and "over slips" or "short slips" were prepared reflecting the error and were given to the pick-up men for collection or refund. At the Jackson turn-in spot, when the ins checkers were finished with the bet books of the current drawing, the bet books were placed in a suitcase and taken to the main turn-in spot by Milton Winfield, Jr., the bookkeeper and general manager of the Erie and Buffalo operations. The current bet books from the main turn-in spot and from the Jackson turn-in spot were taken to a small room at the main turn-in spot where they were perforated, usually by Fred Fratto, and then returned to the suitcases. However, if for some reason the bet books were not perforated on the day they were brought in, as was frequently the situation in the case of the P.M. bet books, *201 they were placed in a cabinet in the same room until the next day when they were perforated. Erie and Buffalo required that the bet books be perforated in order to eliminate cheating on the part of its employees or writers. At the close of a day's business the bet books from the A.M. and P.M. drawings, the adding machine tapes and the hit slips were stored for safekeeping by one of the trusted employees of Erie and Buffalo. The only employees who had access to the room at the main turn-in spot where the books were kept were Fishman, Jackson, Fratto, Winfield, Sr. and Winfield, Jr. Each day before the time the pick-up men were due to arrive, the suitcases containing the perforated bet books of the prior drawing were redistributed to the appropriate turn-in spot. At the turn-in spot the suitcases were given to an employee who was stationed next to the cashier. After the cashier received the hit slips from a pick-up man or writer and made an adding machine tape of the total hits, he would pass the hit slips to the employee with the suitcase containing the bet books. This employee would then remove from the suitcase the bet book to which the hit slip referred and would insert the hit *202 slip into the bet book. The bet books containing the hit slips were then placed on a table where they were checked by employees of Erie and Buffalo known as "outs checkers." The name or initials of the pick-up man and the initials of the outs checker were stamped or written on every hit slip. It was the duty of the outs checker to compare each hit slip with the bet book to which it related in order to verify the correctness of the hits. In verifying the hit, the outs checker would strike off the winning bet in the bet book in which it appeared with a red pencil. In the event a hit slip specified an amount in excess of the amount the winning bet called for, it was the duty of the outs checker to note on the hit slip in red pencil the correct amount. The outs checker would then notify the party sending in the hit slip that the bet called for a lesesr pay-off. In the event a bet slip specified a hit that was not recorded in the bet book, the hit slip would not be approved, a notation would be made on the hit slip, and a copy of it would be given to the pick-up man to be returned to the bettor. Where an alteration, erasure, discrepancy or questioned hit appeared, it was referred by the *203 checkers to either Jackson, Fratto, Fishman, Winfield, Sr. or Winfield, Jr., the trusted employees of Erie and Buffalo, for approval. In order to eliminate cheating, the ins checkers and the outs checkers were forbidden to use black pencils. Furthermore, they, for the most part, had no control over which bet books or hit slips they were to check, and they were usually supervised at all times by one or more of the trusted employees. After the checkers completed verifying the hit slips, one of the trusted employees, usually Winfield, Jr., would take possession of the bet books and hit slips and would take them to the office where they would be placed in boxes. When the boxes were filled, they would be taken to a warehouse for storage. Winfield, Jr., would also collect the net receipts of each drawing and obtain adding machine tapes of the total bets and the total hits of each drawing. The receipts and tapes would then be taken by him to the Erie and Buffalo office. The only employees of Erie and Buffalo who had access to the office were Jackson, Fratto, Fishman, Winfield, Sr., Winfield, Jr., and Ruth Potter. These trusted employees were never accused of or fired for creating Erie *204 and Buffalo. During the years 1948, 1949 and 1950 only one employee of Erie and Buffalo was fired for cheating. During the taxable years the financial statements, records and returns of Erie and Buffalo were prepared by Arthur J. Wilson, a certified public accountant. One of Wilson's duties was to prepare weekly, monthly and yearly summaries of the operation. These summaries were prepared from information supplied Wilson by Winfield, Jr. This information consisted solely of adding machine tapes of total ins and outs for each day's operation and a list of expenses. Wilson was never furnished the bet books, the adding machine tapes accompanying the bet books, the hit slips or the adding machine tapes accompanying the hit slips. He was furnished invoices and paid receipts reflecting Erie and Buffalo's expenses. In addition to preparing the summaries, Wilson maintained for Erie and Buffalo a book of account similar to a cash journal and a payroll record for each employee; he also prepared for Erie and Buffalo social security returns, estimated tax returns and partnership returns. Wilson, prior to 1948, prepared the individual income tax returns of the Benvenutis and after 1948 individual *205 income tax returns of Manno and Pardy. Although Wilson prepared partnership returns for Erie and Buffalo for 1948, 1949 and 1950, as well as individual income tax returns of Manno and Pardy for those same years, and submitted said returns to Manno and Pardy, the only returns prepared by him and subsequently filed with the then Bureau of Internal Revenue were the Erie and Buffalo partnership return for 1948 and the individual income tax returns of Manno and Pardy for 1948. The partnership return of Erie and Buffalo for 1948 was based upon figures contained in a comparative summary for 1948 and 1949 prepared by Wilson from information contained in the cash journal. While employed by Erie and Buffalo Wilson never conducted an audit to reconcile the betting records with the adding machine tapes furnished him. Wilson was also responsible for introducing certain procedures designed to protect Erie and Buffalo against cheating by outsiders and employees. These procedures included the requirement that all bet books be perforated, the requirement that checkers and writers use different colored pencils and the requirement that all bet books be turned in before the drawing was held. Soon *206 after taking over the business in January 1948, Manno and Pardy began a practice of altering the bet books, hit slips and related adding machine tapes of Erie and Buffalo in order to show a larger total of hits than was on said records when they were originally prepared. The practice usually employed was that Manno would alter the bet books and hit slips, and Pardy would prepare new adding machine tapes to correspond with the other two altered records. Pardy was not always present when Manno made the alterations to the bet books and hit slips; however, Pardy was always informed as to the amount of alteration so that he could adjust the adding machine tapes accordingly. The altered adding machine tapes or the figures from these tapes were the ones submitted to Wilson and were the basis upon which he prepared the records and summaries of Erie and Buffalo's operations. The alterations were made after all the employees had left the premises, and none of the employees or Wilson were ever told about the alterations. The addition of a zero to the amount actually wagered on a winning bet, together with a corresponding change to the hit slip, was one of the methods by which Manno and Pardy *207 admittedly altered the books. Manno and Pardy admitted that their alterations enabled them to take out of the business an additional $4,000 to $6,000 each month. The money made available by the alterations would usually be taken by Manno and Pardy a day or two after the actual alterations and would be divided equally between them. In addition to the method of alterations admittedly employed by Manno and Pardy, other types of alterations and irregularities appeared on the betting records of Erie and Buffalo. These alterations and irregularities were, generally, in the nature of inserted writings, i.e., the insertion of a number or bet between two pre-existing numbers or bets; over-writings, i.e., writing over a preexisting number or letter; erasures; variances between bet book totals and top sheet totals; and the appearance of carbon impressions of checkers' pencil slashes and initials on hit slips although the checkers did not use double-faced carbon. It is to be noted, however, that alterations in the bet books frequently appeared on winning as well as losing bets, and it was not uncommon for a bet book or hit slip to contain erasures and other alterations at the time of its receipt *208 from a pick-up man or a writer. Alterations and erasures appearing on the bet books or hit slips at the time of their receipt from a pick-up man or writer were for the most part the corrective acts of betting station operators or writers. During the years 1948, 1949 and 1950 Manno and Pardy made alterations to the betting records of Erie and Buffalo which resulted in the overstatement of deductions for outs on the partnership returns in the amounts of $341,992.84, $277,978.77 and $77,058.45, respectively. On June 22, 1953, Manno and Pardy were indicted for willful attempted tax evasion in violation of section 145(b) as to the years 1948, 1949 and 1950, and on January 15, 1954, both entered pleas of not guilty to all counts of the indictment. On December 3, 1954, in the United States District Court for the Northern District of Illinois, Eastern Division, Pardy withdrew his plea of not guilty to Count 3 relative to the year 1950 and pleaded guilty to said count. Manno on the same day withdrew his plea of not guilty to Count 6 of the indictment relating to the year 1950 and pleaded guilty to said count. Upon such pleas the court found and adjudged Pardy and Manno guilty as charged *209 in Count 3 and Count 6, respectively. At the hearing of these cases Manno and Pardy each admitted they knew that as a result of their altering the betting records of Erie and Buffalo the deductions shown on the partnership returns for 1948, 1949 and 1950 were false, and that as a result of these false deductions their individual income was understated and their individual income tax returns were false. The income tax returns filed by Manno and Pardy for the years 1948, 1949 and 1950 were false and fraudulent. Since Issue (4) in Docket Nos. 45659 and 45660 is directly related to the basic issue in Docket Nos. 77182, 84215 and 84216, the findings of this Court with respect to both issues will be set forth under the latter heading, but the findings will apply to both. Docket Nos. 77182, 84215 and 84216 During the taxable years 1949 and 1950, petitioners Anthony J. Accardo, hereinafter referred to as Accardo, and Clarice Accardo, husband and wife, resided in River Forest, Illinois, and filed joint Federal income tax returns for said years with the then collector of internal revenue, Chicago, Illinois. During the taxable years 1949 and 1950, John (Jack) Guzik, hereinafter referred *210 to Guzik, and petitioner Rose Guzik, husband and wife, resided in Chicago, Illinois, and filed joint Federal income tax returns for said years with the then collector of internal revenue, Chicago, Illinois. On February 21, 1956, Guzik died, and on April 11, 1956, Rose was duly appointed as the administratrix of Guzik's estate and is still acting in such capacity. United States partnership returns of income for the taxable years 1949 and 1950 in the name of Guzik and Accardo were filed with the then collector of internal revenue, Chicago, Illinois, and disclosed "Gross receipts from business or profession from Erie & Buffalo Co. Chicago" in the amount of $278,667.89 and from "E. & B. Co." in the amount of $239,189.23, respectively. These amounts represented 50 percent of the net profits (after adjustments for charitable contributions) reported on United States partnership returns of income for the years 1949 and 1950 which were filed in the name of Sam Pardy and Thomas Manno, d/b/a Erie and Buffalo Co. In the Erie and Buffalo partnership returns for 1949 and 1950 deductions for "Special Services" were claimed in the amounts of $278,667.89 and $239,189.23, respectively. Guzik and *211 Accardo on their respective individual income tax returns for 1949 reported income from the partnership Guzik and Accardo in the amount of $134,207.54. For 1950 Accardo reported income from Erie and Buffalo in the amount of $116,844.62 and Guzik reported income from the partnership Guzik and Accardo in the amount of $116,844.61. Sometime in the latter part of 1948 Manno and Pardy began receiving anonymous phone calls and letters of a threatening nature and from time to time found themselves being followed. At the same time the Erie and Buffalo pick-up men were similarly being threatened and warned to stay away from their routes. In addition, the Erie and Buffalo office was burglarized several times, and on one occasion Manno and Pardy were robbed while on their way to the bank. The police were never notified of these incidents owing to the nature of the business in which Manno and Pardy were engaged. Manno and Pardy decided to talk to Caesar Benvenuti in the hope that he would know what could be done about putting an end to these incidents. However, Caesar told them that it was now their "headache" and they should take care of it the best way they could. Pardy next paid a visit *212 to Accardo, explained to him the trouble he and Manno were having and asked Accardo if he knew of someone who could help them. Pardy stated that he originally sought out Accardo because he was in the gambling business also. Accardo informed Pardy that he was unable to give a definite answer at such time but that he would call Pardy later. Several days later, following a telephone call from Accardo, Pardy went again to Accardo's home. At this meeting Accardo told Pardy he thought he could do something and that he would introduce someone to Manno and Pardy at their next meeting. A day or two later Accardo called Pardy, and as a result Manno and Pardy went to Accardo's home where they were introduced to Guzik. Guzik stated that he was aware of Manno's and Pardy's troubles and that he was in a position to help them. He then inquired as to what they had to offer him. Pardy stated that they were prepared to pay 25 percent of the net profits of Erie and Buffalo. Guzik replied that in view of the work involved, he wanted 25 percent each for himself and Accardo with a guarantee of $10,000 a year. Although 50 percent was more than Manno and Pardy had originally intended to give, they agreed *213 to accept Guzik's proposition. Before leaving, Pardy asked Accardo if he would agree to have the contract put in writing. Accardo agreed and said he would call later about the attorney who would draw the contract. Several days later Accardo called Pardy and Manno and told them to meet him at the office of a Chicago lawyer. When Manno and Pardy arrived at the lawyer's office the contract was already prepared. Manno and Pardy looked it over and then both signed it; Accardo also signed the contract. Guzik was not present but Accardo assured Manno and Pardy that anything he did was "okay" with his partner, Guzik. The contract which was dated January 1, 1949, and signed by Manno, Pardy and Accardo, provided, in effect, that Manno and Pardy engaged Accardo "for the purpose of handling all promotional and public relations matters pertaining" to the Erie and Buffalo business "and further to act as a consultant on such matters as may arise in the conduct of the business"; that Manno and Pardy agreed to pay Accardo 50 percent of the net income of Erie and Buffalo, but not less than $10,000 per annum for such services; that the agreement was to last for 15 years; that Accardo was to pay any *214 expenses incurred by him in the performance of his promotional public relations or consultation services on behalf of Erie and Buffalo; that it was not intended by the agreement to create any partnership between Manno and Pardy, on the one hand, and Accardo, on the other, nor was it intended by the agreement that Accardo was to have any partnership interest in Erie and Buffalo; that Manno and Pardy were to deliver quarterly statements of receipts and disbursements to Accardo and were to permit the latter to examine the books of Erie and Buffalo at all times; and, finally, Manno and Pardy were to make quarterly payments of at least 75 percent of the amount due under the agreement. While the incidents did not cease immediately following the execution of the contract, within 4 or 5 months after its execution they did come to an end. Manno and Pardy admitted they did not know and were not particularly interested in knowing how Accardo put an end to the incidents, and they stated they were willing to pay the amount demanded so long as they got results. Although the agreement provided for quarterly payments, Pardy requested permission to make monthly payments instead. Thereafter, at *215 least once a month during the years 1949 and 1950, Pardy would meet Guzik at a restaurant and pay him $20,000 in cash. At the end of each year a settlement was made of any amounts remaining due under the agreement. As required by the agreement with Guzik and Accardo, annual financial statements of Erie and Buffalo, prepared by Wilson, were submitted by Manno and Pardy to the lawyer for Guzik and Accardo for audit. Although Wilson was responsible for preparing the Erie and Buffalo financial reports and returns, he was never told about the payments to Guzik and Accardo and, consequently, his reports and the returns prepared by him never reflected such payments. The financial statements submitted to the lawyer representing Guzik and Accardo formed the basis upon which the 1949 and 1950 partnership returns of Erie and Buffalo were prepared. The Erie and Buffalo returns actually filed differed materially from the Erie and Buffalo returns prepared by Wilson, but not filed, only with regard to the item which reflected the payments to Guzik and Accardo. Neither Guzik nor Accardo nor their lawyer was aware that Manno and Pardy had falsified the Erie and Buffalo betting records. During *216 the years 1949 and 1950 Manno and Pardy maintained a checking account at the Central National Bank for Erie and Buffalo business purposes. The bank considered the account to be a partnership account. The names of Manno and Pardy were the only ones which appeared on the bank's records, and only Manno and Pardy were authorized to sign checks or withdraw funds from that account. In addition to the checking account, Manno and Pardy also maintained a safety deposit box at the Central National Bank. Guzik and Accardo had no rights of access to this box. During 1949 and 1950 Guzik and Accardo were never seen at the office or turn-in spots maintained by Erie and Buffalo and were not known to the Erie and Buffalo employees. Furthermore, they had no interest in any of the assets of Erie and Buffalo; they did not participate in the operation of the business; and they had no control over the employees of Erie and Buffalo. Guzik and Accardo were not in partnership with Manno and Pardy in the operation of Erie and Buffalo during the years 1949 and 1950. Opinion Docket Nos. 45659 and 45660 FAY, Judge: Issue (1). The respondent determined that payments of $50,000 to Caesar and Leo Benvenuti, *217 respectively, in each of the years 1948, 1949 and 1950 represented capital expenditures to acquire a business and, accordingly, disallowed the deduction of said amounts taken by Erie and Buffalo on its returns filed for said years. Manno and Pardy contend, however, that while they did take over the business from the Benvenutis, the payments to them were not periodic payments of the purchase price but were payments of compensation for services performed by the Benvenutis. We agree with the respondent. The record is clear that the Benvenutis wanted $100,000 a year for 5 years for their business and that Manno agreed to pay this sum in return for the business. Although Manno and Pardy contend that the Benvenutis were always about the premises and assisted them in the operation of the business, they offered no specific evidence of any instance in which the Benvenutis actually performed or rendered services on behalf of Erie and Buffalo. To the contrary, when Manno and Pardy were being besieged by threats, burglaries, etc. and sought the advice and counsel of Caesar Benvenuti as to what could be done, the latter simply replied in the vernacular of a vendor that it was now their "headache" *218 and to handle it the best way they could. Accordingly, we hold that the payments in 1948, 1949 and 1950 to the Benvenutis were made for the purpose of acquiring a capital asset and, hence, are not deductible. Gant v. Commissioner, 263 F. 2d 558 (C.A. 6, 1959) affirming a memorandum opinion of this Court. Issues (2) and (3). Respondent determined that the partnership return of Erie and Buffalo for the year 1949 understated ins, or receipts, in the amount of $25,412.85. The respondent also determined that in the partnership returns of Erie and Buffalo for the years 1948 and 1949 the outs, or hits, were overstated in the amounts of $18,867.61 and $22,095.44, respectively. (The overstated outs referred to here are separate from the outs disallowed under Issue (4), infra, pertaining to the altered betting records.) The respondent's determination contained in a notice of deficiency is presumptively correct, and the burden of proving otherwise is upon the petitioners. Welch v. Helvering, 290 U.S. 111 (1933); Dorothy L. Sutherland, 32 T.C. 862, 866 (1959). The only evidence offered by the petitioners Manno and Pardy to establish the accuracy *219 and validity of the figures contained in the returns was the testimony of Wilson, the Erie and Buffalo accountant, that the figures contained in the cash book were identical to those contained in the partnership returns of income for 1948 and 1949. The fact that the books and records were consistent with the returns proves nothing more than that they were consistent; it does not prove that the figures on the books or on the returns were accurate or truthful. Wilson admitted that he never saw the betting records themselves and that he was merely furnished with what were purported to be summaries of the day's operations. The petitioners Manno and Pardy have failed to carry their burden of showing that the respondent's adjustments were in error. Issue (4). On the 1948, 1949 and 1950 partnership returns of Erie and Buffalo, [3] deductions were claimed for outs, or hits, in the respective amounts of $3,743,389.03, $4,602,177.79 and $4,227,331.80. Following an examination by internal revenue agents of the Erie and Buffalo bet books and hit slips, the respondent determined that a number of said records had been altered and, consequently, determined that the outs for each of said years were *220 overstated in the amounts of $680,042.24, $930,930.35 and $861,412.41, respectively. Accordingly, the respondent increased the reported partnership income for 1948, 1949 and 1950 by these amounts. Manno and Pardy, while conceding that some of the bet books and hit slips were altered by them, contend that their alterations resulted in an overstatement of outs to the extent of approximately $60,000 a year and no more. This Court must therfore decide, first, the extent to which the betting records were altered and, second, the extent to which Manno and Pardy were responsible for the alterations. Whether or not a document has been altered, particularly where subtle or practiced means may have been assiduously employed, is a subject beyond the ken of the average person and, although we hesitate to admit, the ken of this Court. For this reason, regarding the years 1948 and 1949 we have relied to the fullest extent possible upon the opinions expressed by the expert witness of each party as to whether or not a particular bet or hit had been altered. It is to be noted, however, that in those instances in which *221 the expert witnesses were unable to agree as to the character of a particular document, we have tended to give somewhat greater weight to the conclusions of respondent's witness as a result of his more elaborate and scientific examination of the documents. For the years 1948 and 1949, the expert witnesses both agree that the betting records were altered to the extent of at least $200,808.25 and $103,846.50, respectively. While not expressed precisely as such, there also appears to be agreement between the experts that out of the disputed records totalling $680,042.25 in 1948 and $930,930.35 in 1949, no alterations exist as to $86,646.00 and $416,634.83, respectively. [4] Of the remaining $392,588.00 in 1948 and $410,449.02 in 1949, the experts reach opposing conclusions; the petitioners' expert contends no alterations or irregularities exist as to these amounts; the respondent's witness contends that alterations or irregularities do exist as to these amounts. In deference to the witnesses and in fairness to the parties, we have concluded that in 1948 and 1949 $255,182.20 and $266,791.86, respectively, of the amounts upon which the experts were unable to agree represented additional *222 altered betting records. The year 1950 is considered separately because of the manner in which the respondent determined that the partnership of Erie and Buffalo had overstated its outs in the amount of $861,412.41. The books and betting records of Erie and Buffalo for the years 1948, 1949 and 1950 were turned over or made available to the respondent upon his request. For the years 1948 and 1949 respondent's agents examined in detail the daily betting records of Erie and Buffalo and selected those which in their opinion contained alterations or irregularities. These selected betting records allegedly containing alterations or irregularities became the sole basis upon which the respondent determined that the outs for 1948 and 1949 were overstated. For the year 1950 the respondent's agents, instead of examining all of the daily betting records available to them for the year, admittedly made a test audit of only 49 days and as a result found alterations or irregularities *223 totalling $162,093.00. This figure was then projected by some formula or method to the figure contained in the statutory notice, namely $861,412.41. Frequently the exigencies of a given situation have required the respondent to disregard the books and records of a taxpayer and to reconstruct his income by some reasonable method. However, when the issue is solely whether specific records have been altered or falsified, when such records are available to the respondent for his examination, and when no question is raised by the respondent as to the completeness of these records, no compelling reason exists for resorting to artificial or theoretical computations. Therefore, under the circumstances of these cases we believe the respondent's mathematical determination of the amount of altered betting records for 1950 is to be disregarded. Consequently, the only amount that will be considered by this Court as being in controversy for 1950 is the $162,093.00 which represents the determination of respondent as to betting records actually examined. The conclusion of the expert witnesses regarding their examination of the betting records for the 49 days in 1950 may be summarized as follows: *224 The expert witnesses both agree that the betting records were altered to the extent of at least $8,800.00. Again, while not expressed precisely as such, there appears to be agreement that out of the disputed records totalling $162,093.00 no alterations exist with respect to $48,280.00 of that amount. With regard to the balance, or $105,013.00, the witnesses are unable to agree. For the same reasons which moved us for 1948 and 1949, we have concluded that $68,258.45 of the amount upon which the witnesses were unable to agree represented additional altered betting records. Thus, for the years 1948, 1949 and 1950 betting records of Erie and Buffalo were altered to the extent of $455,990.45, $370,638.36 and $77,058.45, respectively. Once having ascertained the total amount of alterations for each year, it becomes necessary to determine what portion of these alterations was attributable to Manno and Pardy. Although the evidence regarding the presence of alterations on the bet books and hit slips at the time of original turn-in was quite general in nature, we are convinced that some of the alterations or irregularities which appear on the Erie and Buffalo betting records were attributable *225 to persons other than Manno and Pardy. However, after scrutinizing the entire record, we are equally convinced that a major portion of the alterations or irregularities was the handiwork of Manno and Pardy. After considering the highly elaborate system of internal controls employed by Erie and Buffalo to eliminate cheating on the part of its employees and others, coupled with the absence of tangible evidence regarding specific instances of cheating by employees or others, and in view of the admissions by Manno and Pardy regarding actual alterations of the books and records, we have concluded that only a portion of the altered betting records were attributable to persons other than Manno and Pardy. Accordingly, we have found as a fact that the amounts of altered betting records attributable to Manno and Pardy for 1948 and 1949 are $341,992.84 and $277,978.77, respectively. Insofar as the year 1950 is concerned, because of the admissions of Manno and Pardy, we have found as a fact that the total amount of altered betting records attributable to them is not less than $72,000.00. Issue (5). On the 1949 and 1950 Erie and Buffalo partnership returns business expense deductions were claimed *226 for amounts paid to Guzik and Accardo during said years. The respondent disallowed these deductions. The petitioners Manno and Pardy have the onus of showing that the payments to Guzik and Accardo represented ordinary and necessary expenses of Erie and Buffalo. The only evidence presented by Manno and Pardy bearing materially on this issue was to the effect that they had purportedly engaged Guzik and Accardo for the purpose of putting an end to certain acts or "incidents" of an unlawful nature which had plagued them and that within 4 or 5 months after entering into the agreement with Guzik and Accardo the "incidents" ceased. However, no evidence was offered to show the nature of the services allegedly rendered by Guzik and Accardo to Erie and Buffalo or for that matter to show that Guzik and Accardo actually performed specific services on behalf of Erie and Buffalo. Since the petitioners Manno and Pardy have failed to produce such evidence, they have not sustained their burden of proving that the payments to Guzik and Accardo represented ordinary and necessary business expenses. Welch v. Helvering, supra; Stanley Rosenstein, 32 T.C. 230 (1959). Accordingly, *227 the respondent's determination is sustained. Issue 6. The respondent determined that for each of the years 1948, 1949 and 1950 some part of the deficiency was due to fraud with intent to evade tax. At the hearing of these cases both Manno and Pardy admitted that they had altered the books and records of Erie and Buffalo so as to show greater payouts and admitted that they had knowingly understated their income and filed false income tax returns for the years 1948, 1949 and 1950. The record also showed that both Manno and Pardy pleaded guilty to indictments for income tax evasion for the year 1950. Such facts are sufficient to sustain respondent's burden of proving that some part of the deficiencies for 1948, 1949 and 1950 was due to fraud with intent to evade tax. Accordingly, the respondent's determination of the additions to tax for fraud is sustained. Leon Papineau, 28 T.C. 54, 58 (1957); Robert Kenneth Black, 19 T.C. 474 (1952). Docket Nos. 77182, 84215 and 84216 The respondent determined, in effect, that Guzik and Accardo were partners of Manno and Pardy in the operation of Erie and Buffalo and, consequently, respondent increased Guzik's and Accardo's *228 respective incomes by 25 percent of the net income of Erie and Buffalo. Guzik and Accardo contend that they were independent contractors with respect to Erie and Buffalo and, hence, taxable only on income actually received from that source. The courts have generally held that whether or not a partnership exists is basically a question of the intention of the parties, the determination of which requires an inquiry into all the surrounding circumstances. Commissioner v. Tower, 327 U.S. 280 (1946); Commissioner v. Culbertson, 337 U.S. 733 (1949). The record reveals, in part, that Guzik and Accardo did not participate in the conduct of the Erie and Buffalo operation; that they were not known by the Erie and Buffalo employees or the company's accountant; and that they were never seen on the premises. In addition, they had no rights with respect to the checking account or the safety deposit box maintained by Manno and Pardy for the business of Erie and Buffalo. Finally, Manno and Pardy declared in statements against their pecuniary interest that it was never their intention to become partners with Guzik and Accardo. It appears that the Government's claim *229 is predicated primarily upon the fact that Guzik and Accardo were each to receive 25 percent of the net income of Erie and Buffalo. While the sharing of profits is considered to be one of the tests indicative of the existence of a partnership, it is only one of the tests and is not determinative per se. Plains Realty Co., 31 B.T.A. 412 (1934). Considering the record as a whole, it is the opinion of this Court that Guzik and Accardo were not partners of Manno and Pardy and, hence, were not subject to tax on amounts earned by Erie and Buffalo but not actually paid to them. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Thomas Manno and Mamie Manno, Docket No. 45660; Anthony J. Accardo and Clarice Accardo, Docket No. 77182; Anthony J. Accardo and Clarice Accardo, Docket No. 84215; and Estate of John (Jack) Guzik, Deceased, Rose Guzik, Administratrix, and Rose Guzik, Docket No. 84216.↩
2. All section references are to the Internal Revenue Code of 1939 unless otherwise indicated.↩
3. The return for 1948 was filed in the name of Sam Pardy and Thomas Manno.↩
4. The petitioners' expert witness concluded that no alterations existed as to these amounts, and the respondent's expert stated he was unable to testify that alterations existed with regard to these amounts.↩